UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


Judith Rotunno,

        Plaintiff,

        v.                                          Civil Action No. 5:11-CV-59

Michael J. Astrue,
Commissioner of Social Security,

        Defendant.


## REPORT AND RECOMMENDATION
(Docs. 12, 17)

Plaintiff Judith Rotunno brings this action pursuant to 42 U.S.C. § 405(g) of the

Social Security Act, requesting review and remand of the decision of the Commissioner

of Social Security ("Commissioner") denying her application for disability insurance

benefits. Pending before the Court are Rotunno's motion to reverse the Commissioner's

decision (Doc. 12), and the Commissioner's motion to affirm the same (Doc. 17).[1]

For the reasons stated below, I recommend that Rotunno's motion (Doc. 12) be

GRANTED, the Commissioner's motion (Doc. 17) be DENIED, and the matter be

REMANDED for further proceedings and a new decision.

---

[1] While the instant motion was pending, Rotunno filed a "Motion to Supplement Memorandum in Support of Plaintiff's Motion . . . Reversing the Decision of the Commissioner," wherein she sought to supplement her motion to reverse "to inform the Court that the Social Security Administration has found [her] disabled . . . on a subsequent application . . . as of November 6, 2010, the day after the ALJ's decision in the current matter." (Doc. 16 at 1.) Although the Motion was granted by text order (*see* Doc. 21), the favorable status of Rotunno's subsequent disability application does not affect the conclusions of this Report and Recommendation on Rotunno's pending motion to reverse (Doc. 12), which relates to a different application.

## Background

Rotunno was forty-six years old on the alleged disability onset date of May 31, 2008. She has a high school education, and had a Licensed Nursing Assistant certificate which expired over a decade ago. She has work experience as a personal care assistant for elderly individuals and a housekeeper at a hospital. She is divorced, and has an adult daughter.

The record reveals that Rotunno had a troubled childhood, and has had a history of domestic abuse. (AR 293, 447, 491.) She has had multiple suicide attempts; and several of her family members have committed suicide. (AR 278-84, 292, 492-94.) She suffers from social phobia, anxiety, and depression; as well as back pain, mild irritation of the stomach, and carpal tunnel syndrome. On a typical day during the alleged disability period, Rotunno performed self-care and household chores, watched television, visited with neighbors and her daughter, and cared for her cats. (AR 39-40, 232-36.) She occasionally left the house for appointments and errands, but had difficulty being around others and would get anxious and nervous. (AR 39-40.) From December 2008 until March 2009, Rotunno worked on a hospital cleaning crew for approximately forty hours a week. (AR 44-47, 242, 561.) She quit that job, however, because of her social phobia, anxiety, and depression. (*Id.*) Thereafter, for approximately three months in the summer and fall of 2009, she worked part-time as a caregiver for Helen Giard, an elderly woman. (AR 40-43, 242, 251, 604.) She was unable to keep that job as well, again due to stress and anxiety. (*Id.*)

In November 2009, Rotunno filed applications for social security income and disability insurance benefits. In her disability application, she alleged that she stopped working on October 30, 2009 due to anxiety, depression, and back problems. (AR 242.) She further alleged that, although she attempted to work in 2008 and 2009 as a housekeeper and a caregiver, she was forced to stop these jobs because of her disability. (*Id.*) Rotunno's application was denied initially and upon reconsideration, and she timely requested an administrative hearing. The hearing was conducted on October 6, 2010 by Administrative Law Judge ("ALJ") Debra Boudreau. (AR 24-72.) Rotunno appeared and testified at the hearing, and was represented by an attorney. A vocational expert ("VE") also appeared and testified. (AR 55-70.) During the hearing, Rotunno amended her alleged disability onset date to May 31, 2008. (AR 29.)

On November 5, 2010, the ALJ issued a decision finding that Rotunno was not disabled under the Social Security Act from her alleged onset date through the date of the decision. (AR 7-18.) A few months later, the Decision Review Board notified Rotunno that it had not completed its review of the claim during the time allowed, making the ALJ's decision final. (AR 1-3.) Having exhausted her administrative remedies, Rotunno filed the Complaint in this action on March 10, 2011. (Doc. 3.)

### ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so

engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if the impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), meaning "the most [the claimant] can still do despite [his or her mental and physical] limitations," based on all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545, 416.920(e), 416.945. The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Boudreau first determined that Rotunno had not engaged in substantial gainful activity since her alleged onset date of May 31, 2008. (AR 10.) At step two, the ALJ found that Rotunno had the severe impairments of affective disorder and an anxiety disorder. (*Id.*) Conversely, the ALJ found that Rotunno's lumbago (back pain), mild reactive gastropathy (chemical irritation of the stomach), and carpal tunnel syndrome were non-severe, given that they did not have a significant effect on Rotunno's ability to perform basic work activities. (*Id.*) At step three, the ALJ found that none of Rotunno's impairments, alone or in combination, met or medically equaled a listed impairment. (AR 10-11.)

Next, the ALJ determined that Rotunno had the RFC to perform a full range of work at all exertional levels with the following nonexertional limitations:

> Limited to work in a low stress setting defined as no interaction with the general public, no crowded workplace with intense contact with multiple coworkers and harsh supervisors; she is able to tolerate occasional interaction with coworkers and supervisors in a low stress environment; changes to the work routine should be infrequent.

(AR 11.) Given this RFC, the ALJ found that Rotunno was unable to perform her past relevant work as a personal care attendant or a home attendant. (AR 16.) Based on testimony from the VE, however, the ALJ determined that Rotunno could perform other jobs existing in significant numbers in the national economy, including price marker, "inserter advertising supplements in newspaper," and "laundry sorter and classifier." (AR 17.) The ALJ concluded that Rotunno had not been under a disability from the alleged onset date through the date of the decision. (AR 17-18.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the fact[-]finder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971);

*Poupore*, 566 F.3d at 305.  In its deliberations, the court should consider that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

### I.      Substantial Evidence Does Not Support the ALJ's RFC Determination.

Rotunno claims that the ALJ erred by: (a) failing to consider whether Rotunno had the ability to meet the basic mental demands of work as defined in Social Security Ruling ("SSR") 85-15; (b) omitting from her RFC determination and hypothetical to the VE a moderate limitation in concentration, persistence, and pace; and (c) failing to include in her RFC determination and hypothetical to the VE that Rotunno's ability to sustain work would be occasionally interrupted due to episodic increases in anxiety and depression which would temporarily undermine Rotunno's cognitive efficiency.  (Doc. 12-3 at 4-14.) These claims can be combined and simplified to assert that the ALJ's RFC determination is not supported by substantial evidence.

As noted above, the ALJ limited Rotunno to work in a "low stress setting," defined as having "no interaction with the general public" and "no crowded workplace with intense contact with multiple coworkers and harsh supervisors."  (AR 11.)  The ALJ further limited Rotunno to a job involving only "infrequent" changes in the work routine. (*Id.*)  This assessment is not entirely consistent with the opinions of treating therapist Dr. Tomoko Kunita[2], treating psychiatric nurse practitioner Pat Manion, and agency

---

[2]  Although Tomoko Kunita is not a licensed psychologist or psychiatrist, or a medical doctor, the record reflects that she has a Ph.D., and thus she is referred to herein as "Dr. Kunita."  (*See* AR 15, 634.)

consultants Drs. Ellen Atkins and Joseph Patalano, all of whom opined that Rotunno was

more severely limited in her ability to handle stress and social interaction, deal with

changes in the workplace, and concentrate for significant periods of time.

Dr. Kunita, a licensed marriage and family therapist who treated Rotunno on a

frequent basis throughout the alleged disability period, opined in April 2010 that

Rotunno's ability to work was limited because of social phobia, and that Rotunno "may

be able to work [only] a small number of hours alone or with one person in a familiar

place." (AR 561.) Noting that Rotunno could not continue her prior jobs "because of her

anxiety around people," Dr. Kunita stated that Rotunno "could not have smooth social

interactions with others, including her boss[,] . . . and had difficulty even going grocery

shopping." (*Id.*; *see also* AR 634.) In August 2010, Dr. Kunita further opined that, due

to symptoms of "social phobia and depression," Rotunno had "a substantial loss of

ability" to accept instructions and respond appropriately to criticism from supervisors,

and "ha[d] difficulty maintaining [a] job." (AR 632-33.) Dr. Kunita stated that

Rotunno's "high level of anxiety prevents her from going to and performing work." (AR

633.) Similarly, Rotunno's treating nurse practitioner, Pat Manion, opined in August

2010 that Rotunno would be absent from work "weekly" "due to her depression/anxiety."

(AR 645.) The treatment notes of Dr. Kunita and Manion, as well as those of other

providers, support these opinions. (*See, e.g.,* AR 291 (May 2005 suicide attempt); 323

("long history of depression and anxiety"); 426, 429, 434 (carrying diagnosis of major

depressive disorder, "severe"); 437 ("experiencing anxious, fearful thoughts, irritable

mood[,] and diminished interest or pleasure") ("not working b/c [of] anxiety and

depression," "no motivation"); 441 ("remains very depressed and has not been able to work"); 494 ("struggle[s] with a recurrent major depressive disorder" and "also appears to have had a recent emerging social phobia . . . which is becoming increasingly problematic"); 540 ("extremely difficult to meet home, work, or social obligations"); 603 (sleeping a lot and unable to get up to go to church); 598 (experienced "social anxiety" at a gas station); 605 (not motivated, depressed, "hard to get up [in the] morn[ing]"); 606 (nervous at work, "want[s] to crawl to a hole and hide").)

In May 2010, Dr. Ellen Atkins, a non-examining agency consultant, opined that Rotunno was "limited for all stressful tasks as she has extremely low stress tolerance," and that Rotunno would have "episodic increases in anxiety and/or depression which [would] temporarily undermine [her] cognitive efficiency." (AR 565-66.) Dr. Atkins further opined that Rotunno should be limited in her contact with the general public, crowded workplaces, intense contact with multiple coworkers, and harsh supervisors; and would "do best in solitary tasks." (AR 566.) The February 2010 opinion of Dr. Joseph Patalano, another non-examining agency consultant, contains virtually the same language as Dr. Atkins's May 2010 opinion. (AR 511-12.) Although the ALJ stated that she gave "great weight" to these agency consultants' opinions and to most of Dr. Kunita's opinions (discussed in detail below), and "moderate weight" to Manion's opinions (AR 15); the ALJ's RFC determination does not effectively account for the limitations contained in these opinions. Specifically, the ALJ's RFC determination – which restricts Rotunno merely to low-stress work with infrequent changes in the work routine and only occasional interaction with coworkers and supervisors – does not include a limitation for

9

*all* stressful tasks, does not account for periodic increases in anxiety and depression

which temporarily undermined Rotunno's cognitive abilities, and does not address

Rotunno's documented difficulty handling even usual and non-stressful work situations

on a regular basis, *see* SSR 85-15, 1985 WL 56857, at *6 (1985) ("The mentally impaired

may cease to function effectively when facing such demands as getting to work regularly,

having their performance supervised, and remaining in the workplace for a full day.").

The Commissioner argues that the temporary cognitive deficits referred to in the

agency consultants' opinions and elsewhere in the record, "stemmed from [Rotunno's]

social anxiety, which the ALJ accounted for in her RFC." (Doc. 17 at 15.) Dr. Patalano

stated in his report, however, that Rotunno would have problems with concentration and

persistence due to intermittent increases in "anx[iety]/*dep[ression]* [symptoms]," not just

due to social anxiety issues. (AR 511 (emphasis added).) Likewise, Dr. Atkins stated in

her report that it was Rotunno's "episodic increases in anxiety *and/or depression*" which

would undermine Rotunno's cognitive efficiency. (AR 566 (emphasis added).)

Moreover, Drs. Patalano and Atkins recorded Rotunno's social limitations (including

reduced contact with the public and with coworkers) under a different subheading than

they recorded Rotunno's cognitive limitations (including sustaining concentration,

persistence, and pace for only two-hour periods), thereby distinguishing Rotunno's social

and cognitive limitations from one another. (*See* AR 511-12, 565-66, subheadings B and

C.) In another report, Dr. Atkins found that Rotunno's impairments fell within two

separate categories of mental illness: affective disorders, which would include

depression, and anxiety-related disorders, which would include social phobia; again

distinguishing Rotunno's depression from her anxiety.  (AR 567.)

Furthermore, there is significant evidence in the record demonstrating that Rotunno carried the diagnosis of severe depression for much of the alleged disability period, and that her symptoms of depression were not necessarily the same as her symptoms of anxiety/social phobia.  (*See, e.g.,* AR 422, 429, 434, 437, 441, 494, 516, 520, 525, 531, 540, 544, 591.)  Although, as noted by the ALJ (AR 14), the severity of Rotunno's depression lessened at times (*see, e.g.,* AR 494, 525, 531), there were other times when it increased (*see, e.g.,* AR 537, 540, 603, 605).  Moreover, the record taken as a whole reveals that Rotunno's depression persisted throughout the alleged disability period and occasionally existed at a level where it caused what the agency consultants referred to as "cognitive inefficiency," including difficulty maintaining concentration, persistence, and pace.  Other than noting at step three of the sequential evaluation that Rotunno had "moderate difficulties" in "concentration, persistence or pace" (AR 11), and later stating somewhat conflictingly that Rotunno "does not present with any attention, concentration, or memory problems" (AR 14); the ALJ did not analyze evidence in the record, including the agency consultants' opinions, which indicated that Rotunno experienced episodic increases in anxiety or depression that would affect her ability to concentrate and perform other mental tasks consistently during a normal workday.

The ALJ's RFC determination is also inconsistent with the opinion of the daughter of Rotunno's former employer, A. Giard-Chase.  (AR 251-52.)  Giard-Chase stated on a "Job Screening Questionnaire" form that Rotunno missed some work days as a result of her anxiety disorder; and that, although Rotunno was "an excellent employee," she was

"unable to cope with job stress of any kind." (AR 252.) Giard-Chase further stated that, "[e]ven a minimally stressful job such as caregiving for [her] elderly mother whom other employees found cordial, warm[,] and endearing – created stress for [Rotunno]." (*Id.*) Despite these assertions, and although the ALJ stated in her decision that her RFC determination "adequately consider[ed]" the job limitations identified by Gaird-Chase (AR 13), the ALJ's RFC determination allows for some amount of stress in the workplace. The Commissioner argues that it is "hardly surprising" that Rotunno could not handle the caregiver job for Giard-Chase because it involved "significant social interaction," and certainly more social interaction than the ALJ's RFC included. (Doc. 17 at 18.) Giard-Chase stated, however, that the job of caring for her mother involved little social interaction, including merely socializing with an elderly woman who other employees found to be "cordial, warm[,] and endearing." (AR 252.) This was in fact the only type of job that Dr. Kunita believed Rotunno might be able to perform (AR 561 ("[Rotunno] may be able to work a small number of hours alone *or with one person in a familiar place*.") (emphasis added)); and Rotunno was unable to perform it for more than approximately three months.

In sum, I find that the ALJ's RFC determination (and thus also her hypothetical to the VE) does not accurately reflect Rotunno's mental impairments. Specifically, I find that the ALJ's finding that Rotunno was able to work in a low-stress environment with minimal social interaction fails to account for the documented severity of Rotunno's mental impairments, including her social phobia, anxiety, and depression, as substantiated by the opinions of Dr. Kunita, Nurse Practitioner Manion, and former

12

employer Giard-Chase.  I also find that the ALJ erred in failing to fully account for

Rotunno's depression and resulting cognitive limitations, including difficulty

concentrating; and episodic increase in symptoms, which the agency consultants opined

would affect Rotunno's ability to work a normal workweek on a consistent basis.  For

these reasons, I recommend remanding the claim for a new RFC determination.

## II.     The ALJ Erred in Her Assessment of Dr. Kunita's Opinions.

I also recommend remanding for a reassessment of Dr. Kunita's opinions.  As

discussed above, Dr. Kunita opined, in part, that Rotunno's anxiety would prevent her

from going to and performing work.  (AR 561, 633.)  Rotunno claims that the ALJ erred

in affording "little weight" to this opinion (AR 15); and I agree.

The ALJ began her discussion of Dr. Kunita's opinions by stating that: "Dr.

Kunita has a Ph.D. in psychology but is not a licensed psychologist in the state of

Vermont.  Her opinion is given weight *as a non-medical source* and in her role as a

therapist."  (AR 15 (emphasis added).)  The ALJ erred in referring to Dr. Kunita as a

"non-medical source."  Although the record reflects that Dr. Kunita was not a licensed

psychologist, and thus not an "acceptable medical source," she is clearly an "other

[medical] source," as she is a treating licensed marriage and family therapist.  SSR 06-

03p discusses how ALJs should handle evidence from "other sources," and defines the

phrase to include "therapists" such as Dr. Kunita:

> In addition to evidence from "acceptable medical sources," we may
> use evidence from "other sources," as defined in 20 CFR 404.1513(d) and
> 416.913(d), to show the severity of the individual's impairment(s) and how
> it affects the individual's ability to function.  These sources include, but are
> not limited to:

> • *Medical sources who are not "acceptable medical sources," such as* nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and *therapists* . . . .

SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006) (emphasis added). SSR 06-03p requires ALJs to evaluate the opinions of "other" medical sources in some depth, stating: "Opinions from these [other] sources . . . who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.* at *3. The ruling directs ALJs to use the same factors for the evaluation of "other source" opinions as are used to evaluate opinions from "acceptable medical sources." *Id.* at *4 (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)). These factors include the length of the treatment relationship, the frequency of evaluation, the degree to which the opinion is supported by other evidence, and the opinion's consistency with the record as a whole. *Id.*

As noted above, Dr. Kunita treated Rotunno on a frequent basis throughout the alleged disability period; and her opinion is supported by her own treatment notes and is consistent with other evidence, including the opinions of Nurse Practitioner Manion, Drs. Atkins and Patalano, and former employer Giard-Chase. Moreover, the ALJ's reasoning for affording "little weight" to Dr. Kunita's opinion is not supported by substantial evidence. The ALJ defended her decision to afford "little weight" to Dr. Kunita's opinion that Rotunno's anxiety would prevent her from going to and performing work on the grounds that the opinion is "not supported by the evidence of record." (AR 15.)

More specifically, the ALJ relied on Rotunno's daily activities to discount Dr. Kunita's opinion, stating: "Dr. Kunita's treatment notes . . . document various activities [that Rotunno] has been engaged in, including going to small claims court and visiting with friends and families . . . ." (*Id.*)

The fact that Rotunno was able to "go[] to small claims court" and "visit[] with friends and famil[y]," does not preclude the possibility that she was unable to work at a full-time job. First, Dr. Kunita's report appears to indicate that Rotunno's involvement with the small claims action caused her anxiety. (AR 634.) Second, it is unclear from the record the extent of Rotunno's involvement in the small claims action – preparing a statement/argument for an informal appearance before a judge and then appearing before that judge for a hearing lasting no more than one day, does not equate to working for eight hours continuously five days a week. *See* SSR 96-8p, 1996 WL 374184, at \*2 (July 2, 1996) (noting that the claimant's RFC reflects his or her ability to do sustained work activities "in an ordinary work setting on a regular and continuing basis," meaning "8 hours a day, for 5 days a week, or an equivalent work schedule"). As for Rotunno visiting with friends and family, it appears that the "friends" Rotunno visited with were her neighbors, who presumably lived in very close proximity to her, given that she lived in a mobile home at a trailer park. (AR 11, 34-35, 232, 236.) The "family" that Rotunno visited appears to be her adult daughter and her daughter's boyfriend. (AR 232, 236.) It does not follow that, because Rotunno was able to visit with her daughter, her daughter's boyfriend, and her neighbors at a trailer park; she was able to perform work on a

consistent basis in a competitive work environment.[3]  Dr. Kunita's opinions and

treatment notes specify that Rotunno's social anxiety was triggered by people other than

her close family and friends, particularly people with and for whom she worked.  (*See,*

*e.g.,* AR 561, 597, 598, 602, 603, 606, 607, 633-34.)  Therefore, it was not inconsistent

for Dr. Kunita to opine that Rotunno's anxiety prevented her from going to and

performing work on a regular basis, while also acknowledging that Rotunno was able to

engage in certain limited activities, including visiting with friends and family and

representing herself in a small claims action.  It was never Dr. Kunita's opinion that

Rotunno was completely unable to leave the house at all or engage in any type of social

activity.

The Commissioner argues that Dr. Kunita's opinion that Rotunno's anxiety would

prevent her from going to and performing work is an issue reserved for the

Commissioner.  In response, Rotunno correctly points out that the ALJ did not reject Dr.

Kunita's opinion for that reason, but rather, because it was "not supported by the

evidence of record," particularly Rotunno's daily activities, as discussed above.  (AR 15;

*see* Doc. 20 at 2.)  The Second Circuit has held that courts may not uphold ALJ decisions

based on reasons not articulated by the ALJ and explained by the Commissioner solely on

a *post-hoc* basis.  *See Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) (a reviewing court

"may not accept . . . counsel's *post hoc* rationalizations for agency action") (quotation

_____

[3]  Likewise, records indicating that Rotunno was able to visit her nephew at the hospital and attend a funeral during the alleged disability period do not demonstrate that Rotunno was able to work at a full-time job, especially considering that Rotunno told Dr. Kunita that it was "difficult" for her to go to the hospital, as she felt anxious and confused there; and she "dealt with her anxiety" at the funeral.  (AR 596, 598.)

omitted); *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) ("[The court] may not properly affirm an administrative action on grounds different from those considered by the agency.") (quotation omitted). Moreover, the ALJ could not lawfully ignore the opinion, as Social Security Ruling 96-5p provides that, where the record contains an opinion from a medical source on an issue reserved to the Commissioner, the ALJ "must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." SSR 96-5p, 1996 WL 374183, *3 (July 2, 1996). Here, as discussed above, Dr. Kunita's opinion is supported by the record, including her own treatment notes.

### III.    The ALJ's Determination of the Number of Jobs Rotunno Could Perform

Finally, Rotunno asserts that the ALJ erred in determining the number of jobs that she could perform. (Doc. 12-3 at 16-17, Doc. 20 at 8-9.) The Court need not decide this issue, however, because the ALJ's step-five decision that Rotunno could perform other jobs existing in significant numbers in the national economy (*see* AR 17) was necessarily affected by the errors described above, and must begin anew on remand after the ALJ has reassessed Dr. Kunita's opinion and re-determined Rotunno's RFC.

### Conclusion

For these reasons, I recommend that Rotunno's motion (Doc. 12) be GRANTED, the Commissioner's motion (Doc. 17) be DENIED, and the matter be REMANDED for further proceedings and a new decision in accordance with this ruling.

Dated at Burlington, in the District of Vermont, this 27th day of March, 2012.


/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge


Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c). Failure to timely file such objections operates as a waiver of the right to appellate review of the District Court's adoption of such Report and Recommendation. *See* Fed. R. Civ. P. 72(a); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).